**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA,

 v.

JAMES BOTTI,

     Defendant.

3:08-cr-00230 (CSH)

**MEMORANDUM OF DECISION**

HAIGHT, Senior District Judge:

This Memorandum of Decision sets forth the reasons for certain of the Court's Rulings on Pre-Trial Motions filed on September 17, 2010 [Doc. # 257].

I.     **Part XII — Character Evidence of Defendant's Tendency To Exaggerate**

The government intends to offer evidence of a number of statements by the defendant. Some are recorded on tape. Others will be described by witnesses.

The government contends correctly that defendant's own statements are admissible as admissions by a party-opponent pursuant to Fed. R. Evid. 801(d)(2)(A). Such statements are not hearsay and may be admitted for the truth of what they assert. The government says that defendant's statements truthfully describe his participation in corrupting Shelton public officials. Prominently featured by the government are taped statements by defendant, described in the Indictment, that if any public official interfered with defendant's affairs, he "would expose the corrupt activities of '17 developers and a good chunk of town hall' in Shelton," and that "he could cause the Federal Government to 'collapse the town hall.'" Redacted Indict. [Doc. #229] ¶ 20. The government will presumably argue to the jury that these declarations and others like them, heard by the jury in defendant's own voice, accurately portray defendant as a participant in the corruption of Shelton's public officials.

The case for the defense is that such statements by defendant are — like all of his statements — no more than hyperbole, bombast and grandiosity.   It follows, the argument continues, that to the extent the government offers defendant's statements for their truth, the jury should be aware of how a listener familiar with defendant might have filtered those statements and discounted their accuracy.   Defendant is, in effect, attacking the credibility of his own statements when the government offers them as admissions against him under Rule 801(d)(2)(A).   The defense intends to cross-examine government witnesses and call witnesses of its own, in an effort to show that "defendant was prone to exaggeration or overstatement." Def.'s Opp'n [Doc. #254] at 11.   The government objected to all such evidence.

Case law supports the defendant.   In *United States v. Shay*, 57 F.3d 126 (1st Cir. 1995), defendant was found guilty of conspiracy and aiding and abetting an attempt to blow up his father's car.   At trial "the government relied primarily on several incriminating statements that Shay Jr. made after the bombing," *id*. at 128, which were received in evidence as admissions under Rule 801(d)(2)(A).   The defense elicited, apparently without objection, "testimony from several witnesses that Shay Jr. regularly told the same grandiose stories, often changing significant details each time he told them."  *Id*. at 129.   Presumably these were lay witnesses, friends and neighbors about the town, the sort of people defendant intends to call to describe his propensity to exaggerate.   In addition, the First Circuit held on appeal that the district court erred in not allowing, for the reasons it stated, the defendant to call a psychiatrist as an expert witness, to testify that defendant suffered from a mental disorder that caused him "to spin out webs of lies which are ordinarily self-aggrandizing and serve to place him in the center of attention," and "entails seeking attention, creating fantasies in which he is the central figure, and through which he attempts to enlist his audience."  *Id*. at 129-30.

In remanding the case to the district court for further proceedings into the admissibility of this evidence, the First Circuit rejected, *inter alia*, the government's contention that "even if expert testimony can be used to prove a testifying witness's untruthful character, it cannot be used to attack the reliability of a defendant's out-of-court statements because the defendant is a declarant, not a testifying witness."  57 F.3d at 131-32.  The First Circuit looked to Fed. R. Evid. 806, which provides in part:

> When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D) or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked, may be supported, *by any evidence which would be admissible for those purposes if declarant had testified as a witness*.

*Id*. at 132.  (emphasis added).  The First Circuit continued in *Shay*: "Although the rule does not expressly include attempts to attack a defendant's out-of-court statements admitted pursuant to Fed. R. Evid. 801(d)(2)(A), the Senate Judiciary Committee's report concerning the proposed rules states":

> The committee considered it unnecessary to include statements contained in Rule 801(d)(2)(A) and (B) – the statement by the party-opponent himself or the statement of which he has manifested his adoption – because *the credibility of the party-opponent is always subject to an attack on his credibility*.

*Id*. (emphasis added).  That attack on credibility may, as *Shay* holds, be made by the defendant himself as party-opponent, availing himself under Rule 806 of any admissible evidence available to him, whether or not he takes the stand and testifies.

In *Shay*, the First Circuit went on to discuss the admissibility of the defendant's proffered expert testimony under Rules 701 *et seq.*, a question that does not arise in the present case, since defendant has not indicated an intent to present expert opinion testimony on his propensity to hyperbole and bombast.  The witnesses with respect to this issue will be lay persons.  However,

these quotations from the *Shay* opinion and the Rules' legislative history furnish guidance in this

case, because the First Circuit's analysis at that point turns upon evidentiary rules of broader

application.  Rule 806 is one of those rules.

      Other rules also support defendant's position.  Rule 404 provides in pertinent part:

> **(a) Character evidence generally. –** Evidence of a person's
> character or a trait of character is not admissible for the purpose of
> proving action in conformity therewith on a particular occasion,
> except:
>
> **(1) Character of accused. –** In a criminal case, evidence of  a
> pertinent trait of character offered by an accused . . .

In the case at bar, the government makes defendant's asserted character trait of hyperbole and

bombast *pertinent* when it offers his declarations for their truth.  It would offend principles of

fairness to allow the government to argue to the jury that such declarations accurately portray

defendant's conduct, motivation and intent, but bar defendant from eliciting evidence of his

propensity to hyperbole and bombast which, if accepted by the jury, could diminish the

inculpatory effect of the defendant's declarations and the force of the government's proof.

      Rule 405, captioned **Methods of Proving Character**, picks up where Rule 404 leaves

off.  Rule 405 provides:

> **(a) Reputation or opinion.**  In all cases in which evidence of
> character or a trait of character of a person is admissible, proof
> may be made by testimony as to reputation *or* by testimony in the
> form of an opinion.  On cross-examination, inquiry is allowable
> into relevant specific instances of conduct.
>
> **(b) Specific instances of conduct.**  In cases in which character or
> a trait of character of a person is an essential element of a charge,
> claim, or defense, proof may also be made of specific instances of
> that person's conduct.

(emphasis added).   Speaking in a bombastic or grandiose manner does not constitute an

"essential element" of the crimes charged against defendant, so Rule 404(b) is not implicated.

But as I have already said, evidence of defendant's propensity to speak in that manner is a "pertinent trait of character" under Rule 404(a), and thus admissible, so Rule 405(a) is implicated.   As the emphasized disjunctive in Rule 405(a) makes plain, it allows both lay reputation testimony and expert opinion evidence on the issue.

When these provisions in Rules 404 and 405 are read together with Rule 806, allowing the credibility of defendant's Rule 801(d)(2)(A) declarations to be attacked "by any evidence which would be admissible" for that purpose "if declarant had testified as a witness," I conclude that the Rules entitle defendant to offer the evidence under discussion.

*Au fond*, the question is one of the fairness of the trial process.  The Second Circuit articulated that theme in *United States v. Han*, 230 F.3d 560 (2d Cir. 2000).  Defendant was convicted of "knowingly and willfully traveling in interstate commerce for the purposes of engaging in a sexual act with a person under 18 years of age."  *Id*. at 561.  The trial judge excluded defendant's proffered testimony of "a witness who would testify that Han was law abiding and did not exploit others."*Id*.  at 562.  The Second Circuit ruled that "the trial court erred in excluding the proffered reputation testimony."  *Id*. at 564.  The court of appeals held that this evidence was admissible under Rule 404(a)(1), which "applies a lower threshold of relevancy to character evidence than that applicable to other evidence," in that evidence of "a pertinent trait of character" is not based on an expectation that such evidence will prove helpful." *Id*.  Instead, the Second Circuit reasoned in *Han*:

> The justification appears to be based on notions of fairness rather than logic; the defendant who, with the considerable forces of government arrayed against him and who may have little more than his good name to defend himself, should not be precluded from presenting even such minimally probative evidence.  Thus, Rule 404(a)(1) requires only that the proffered evidence of a character trait *relate to some element at issue in the case*.

*Id*. (citation and internal quotation marks omitted) (emphasis added).  The "element at issue" in this case is the credibility of defendant's declarations, which the government will offer for their truth under Rule 801(d)(2)(A).  Although the reputation evidence in *Han* was offered to "contradict the government's allegation of criminal intent," *id*., I do not read *Han*'s fairness rationale to apply only to evidence concerning the essential elements of a charge.  So narrow a reading would be inconsistent with the broader "methods of proving character" spelled out in Rule 405.  *Han* supports the conclusion I reach that defendant's proffered reputation evidence is admissible under the Federal Rules of Evidence.

## II.     Parts I and X

The ruling in Part I deals with the government's proffer of evidence concerning cash, cash deposits and payments, and concealing cash.  Many of the rulings in Part X on admissibility of specific items of evidence relate to those categories of evidence.  The government seeks to admit this evidence in its-case-in chief on the trial of the corruption counts.  Defendant moves *in limine* to exclude most of it.

Defendant's *in limine* motion is based principally upon the Court's earlier opinion, reported at 2009 WL 3157582 (D. Conn. Sept. 25, 2009) ("the Severance Opinion"), which granted the defense motion for a severance of certain counts for trial.  Defendant's motion misconstrues the purpose of the Severance Opinion and exaggerates its effect in the present context.  The purpose of a motion to sever counts is to determine if it is fair to try all the counts in an indictment before the same jury.  The Severance Opinion held principally that it would be unfair to defendant to try the money counts and the corruption counts in a single trial before the same jury.  Severance was granted because the unambiguous evidence of defendant's guilt of structuring could cause a jury that convicted him of structuring to cumulatively convict him of

corruption.  That was a determination about the fairness of the way a trial is structured; it was not a determination of the fairness in admitting or excluding particular pieces of evidence.

The purpose of the present *in limine* motion is to determine if specific evidence is admissible at the trial of the severed corruption counts.  Defendant's *in limine* brief quotes at length from the Severance Opinion, and some of its language may appear at first blush to support his effort to exclude some of this evidence, but the fairness of severing counts does not control the admissibility of evidence at a trial of counts that were severed.

Admissibility turns primarily upon the relevance of the evidence to the issues to be tried. The Federal Rules of Evidence are generous in their definitions of relevance and admissibility. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action  more probable or less probable than it would be without the evidence."  Rule 402 provides succinctly: "All relevant evidence is admissible [except for certain circumstances not pertinent here].  Evidence which is not relevant is not admissible."

The admissibility of the government's proffered evidence at the corruption trial will be evaluated by applying Rules 401 and 402.  If the evidence is deemed relevant, only then must I determine whether it would be unfair to defendant to admit that evidence, by subjecting it to the balancing exercise described in Rule 403.

 The government's proffered evidence shows that beginning in June 2006, defendant (1) kept large amounts of cash in his office safe or at home, and (2) took steps to conceal the existence of that cash, principally through structuring bank cash deposits and withdrawals in amounts that would avoid IRS reporting requirements.  The government refers to this accumulation of cash as a "slush fund," and says that defendant's conduct shows his

"consciousness of guilt" and intentional "concealing" of the cash.

The government does not demonstrate the admissibility of this evidence by the simple repetition of mantras like "slush fund," "consciousness of guilt," or "concealing." There must be evidence connecting one or more of these concepts to the corruption charged in the indictment: conspiracy to defraud the citizens of Shelton; bribery of Public Official # 1; and mail fraud to obtain money and property and defraud the citizens of Shelton. The purported slush fund must have been used to further that corruption, or intended for such future use, and not used or intended for unrelated purposes. Similarly, defendant must have been conscious of his guilt of that corruption, and not of some other wrongful act. And he must have concealed the cash as a means of concealing that corruption, and not some other underlying conduct.

The evidence being considered is relevant under Rule 401 and hence admissible under Rule 402 if it has any tendency to make defendant's participation in the crimes of corruption charged — conspiracy, bribery, and mail fraud — more probable than it would be without the evidence. As I noted in the Severance Opinion at *4, it is true that many of defendant's alleged acts of corruption are temporally distant from the alleged acts of concealment of cash. Nevertheless, the government has proffered evidence that connects these alleged acts of concealment with the earlier acts of corruption. Specifically, the government proffered testimony by "Witness A" that he encountered defendant on the evening of July 14, 2006, after defendant had been interviewed by an IRS agent for several hours earlier that day. During that encounter, defendant informed Witness A that he was "nervous and scared," and he thought the IRS was after him because of the work he did for Public Official #1. *See* Gov't's Resp. to Def.'s Mot. in Limine to Preclude Any Evidence Relating to the Corruption Charges or the Corruption

Investigation [doc. #144] at 3 (Oct. 23, 2009).[1]  In other words, defendant feared the purpose of the government's "tax" inquiry was to uncover corruption, even if that purpose was not initially disclosed to him.

Furthermore, the indictment alleges that the cash that Botti maintained was specifically used for corrupt purposes.[2]  In particular, ¶ 35 of the Redacted Indictment alleges that in 2006 defendant "maintained hundreds of thousands of dollars in his office safe," and that to induce Public Official # 1 to use his position to benefit defendant, defendant "permitted Public Official # 1 to take cash from [defendant's] office safe."

Thus, a rational jury would be entitled to draw some connection between the cash, efforts to conceal that cash, and the charged corruption.  That potential connection is sufficient to make the evidence relevant to the truth of those charges, and accordingly admissible at the corruption trial.

Moreover, the evidence is not excludable under Rule 403.  The Rule provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."  This evidence is of course prejudicial to defendant; were it otherwise, the evidence would probably not be relevant.  Rule 403 asks whether the prejudice is unfair.  It will not be unfair because counsel are agreed that no mention will be made of the crime of structuring or the outcome of the structuring trial.  That agreement preserves the fairness assured by the severance, and eliminates any impediment to the evidence's admission on the government's case.

---

[1]	The government initially made this proffer in the context of the trial on the money counts.  In that case, the government specifically offered to instruct Witness A *not to testify* to the defendant's fear that the IRS agent's interview was connected to corruption of Public Official #1.  *See id.*

[2]	The evidence the government intends to offer in this area is summarized in its brief [Doc. # 245] at 2-3.

III.     Parts VI, VII, and VIII

The principal question common to these Rulings is the admissibility in the government's case in chief of evidence of the conduct of developers in Shelton other than the defendant.

The government's theory, implicit in its briefs and made explicit during the argument, is that defendant and the other developers were members of a single "wheel" conspiracy, with Public Official # 1 at the hub and the developers, including defendant, being the spokes. The government's motion [Doc. # 245] at 11 asserts that the indictment alleges defendant engaged "in a long running and broad corruption conspiracy involving developers and public officials," and quotes Second Circuit cases for the familiar conspiracy principles:

> When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made a partnership in crime. What one does pursuant to their common purpose, all do . . . . [W]hen a party joins an existing group already so engaged, he assumes responsibility for all that has been done thereto. For this reason, all that was done before he entered may be used against him.

*Id.* (citations, internal quotation marks, and ellipses omitted).

In order for a conspirator to be bound by the acts of another conspirator, both must have been engaged in a "common purpose," referred to in wheel-conspiracy analysis as "the rim." The government submissions characterize Public Official # 1 as the hub and developers as the spokes of a single conspiracy, but say less about the rim that would bring them all together.

But the rim is a necessary part of a wheel conspiracy. In *United States v. Sureff*, 15 F.3d 225 (2d Cir. 1994), cited by the government, the Second Circuit said: "To prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be *a collective venture directed toward a common goal*." *Id.* at 229 (citation and

internal quotation marks omitted) (emphasis added).  Thus the convicted defendant in *Sureff*

argued that "no evidence directly links  Sureff and Cardone and that no 'rims' had been proved

to turn the 'spokes' of Sureff and Cardone into a 'wheel' conspiracy."  *Id.* (citing *Kotteakos v.*

*United States*, 328 U.S. 750 (1946)). [3]

      The Supreme Court's decision in *Kotteakos*, cited by the Second Circuit in *Sureff*, is the

source of modern wheel conspiracy analysis.  The case bears a rather startling similarity to the

case at bar.  The indictment charged that thirty-two defendants engaged in a single conspiracy to

obtain loan insurance from the Federal Housing Administration based on applications containing

false and fraudulent information.   The architect of the scheme, one Simon Brown, acted as

broker and "was the common and key figure in all of the transactions proven."  328 U.S. at 753.

The Supreme Court reversed the convictions of those who stood trial because the government

charged a single conspiracy but proved several separate ones.   Introducing the concept of the

rim, the Court said:

> As the Government puts it, the pattern was "that of separate spokes
> meeting at a common center," though we may add without the rim
> of the wheel to enclose the spokes.
>
> The proof therefore admittedly made out a case, not of a single
> conspiracy, but of several, notwithstanding [that] only one was
> charged in the indictment.

*Id*. at 755.[4]  The *Kotteakos* Court approved the statements of the Second Circuit that there were

---

      [3]     The Second Circuit rejected Sureff's appeal.  The case involved a conspiracy to
distribute narcotics, a fertile ground for single-versus-multiple-conspiracies jurisprudence.  The
court of appeals held that the government had proved the existence of the wheel's rim because
"[b]oth men had reason to know that in dealing with Metral they were involved with a larger
organization," referred to as "the bank," and each knew that "their conduct was part of a large
conspiracy with the 'bank' at the center."  15 F.3d at 230.
      [4]     *See also Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) ("A
rimless wheel conspiracy is one in which various defendants enter into separate agreements with
a common defendant, but where the defendants have no connection with one another, other than

"at least eight, and perhaps more, separate and independent groups, none of which had any connection with any other, though all dealt independently with Brown as their agent," and the trial judge "was plainly wrong in supposing that upon the evidence there could be a single conspiracy; and in the view he took of the law, he should have dismissed the indictment." *Id*. (quoting the Second Circuit's opinion, 151 F.2d at 172).   The Supreme Court reversed the Second Circuit's holding that this error was harmless.

The case at bar resembles *Kotteakos* because Public Official # 1 – like Simon Brown – is the principal figure at the center of many corrupt transactions, and presumably the developers were separate and independent, competing with each other for business and governmental favor, rather than acting with a "common purpose."  Indeed, the government argues in the next page of its brief that "defendant's awareness of the corrupt activities of others" is probative of his understanding that he had to bribe or provide benefits to public officials "to keep up with other developers." [Doc. # 245] at 12.  This concept of "keeping up with the Joneses" in corruption does not fit easily into the concept of a single-conspiracy wheel with all the developer-spokes enclosed  within the rim of a common purpose, having "agreed on the essential nature of the plan," *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004).

Nonetheless, it would not be appropriate to hold at this *in limine* stage that the government's  evidence about other contractors is inadmissible because a single conspiracy has not been alleged, or if alleged could not be proved.  The indictment adequately alleges a single

the common defendant's involvement in each transaction. . . .  [A] rimless wheel conspiracy is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants."); Joseph F. McSorley, *A Portable Guide to Federal Conspiracy Law* 145 (1996) (describing multiple conspiracies where there is a rimless wheel: "While the hub may view its dealings with the spokes as part of a single agreement, a spoke may be concerned simply with his or her own actions.").

conspiracy.  Under the caption "The Conspiracy to Defraud the Citizens of Shelton," it alleges that defendant "and others" conspired "to obtain money, and property, and to defraud the citizens of Shelton of the intangible right to the honest services of Public Official # 1 and other public officials."  [Doc. #229] ¶ 7.  Whether the government can prove that either or both of the alleged two purposes of the conspiracy – obtaining money and defrauding the citizens – was a common purpose enclosing all developers within the rim of a single conspiracy is a question for trial.  The law of this circuit is that "[t]he matter of whether there existed a single conspiracy as charged in the indictment or multiple conspiracies is a question of fact for a properly instructed jury."  *United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008) (citation and internal quotation marks omitted).  The government is entitled to attempt to prove its case.  The evidence in question is admissible.

It should also be noted that the government's evidence summarized in [Doc. #245] at 17 would establish a separate "triangle" conspiracy involving defendant, Developer Y, and Public Official # 1, whether or not the government can prove a hub-spoke-and rim "wheel" conspiracy.

In these circumstances, it is the Court's present inclination to provide the jury with a special verdict form that will require the jury to specify which of the schemes or artifices alleged in the indictment were proven beyond a reasonable doubt, and the Court will instruct the jury that they may consider evidence of actions by others only to the extent that such actions are related to the scheme or artifice "to deprive the citizens of Shelton of the honest services of its elected and appointed officials."  Redacted Indict. [Doc. #229] ¶ 8; *see also id.* ¶ 7 (describing "a scheme and artifice to obtain money, and property, and to defraud the citizens of Shelton of the intangible right to the honest services of Public Official # 1 and other public officials"). Further submissions by counsel on these subjects will be received.

13

**Part XIII**

The Court hereby augments its reasons for Ruling XIII, which has the additional effect of disposing of defendant's purported disclosure pursuant to Fed. R. Crim. P. 16(b)(1)(C) of Attorney Dominic Thomas as an intended expert and fact witness [Doc. # 261], and the government's objection to such evidence [Doc. # 261]. It is just as well that the Court expand upon its reasons, because defendant does not appear to understand Ruling XIII.

Throughout the *in limine* practice, defense counsel made clear his desire to call Attorney Thomas as a defense witness. As such, Attorney Thomas would describe in detail the Shelton Planning and Zoning laws, and the approval process of Planning and Zoning Commission ("P & Z") as it related to the application by the defendant, his client, for approval of defendant's 828 Bridgeport Avenue Project. Attorney Thomas would also give his opinion as to the project's prospects for approval. Ruling XIII quoted defendant's brief, which characterized this testimony as "evidence from which a jury may conclude that defendant lacked criminal or corruptive intent because the project was on-track for pro-forma approval, in any event."

Ruling XIII sustained the government's objection to this proffered testimony by Attorney Thomas. Opinions, whether lay or expert, that the P & Z Commission would "in any event" have approved defendant's application are irrelevant as a matter of law to the question of whether defendant bribed or corrupted public officials to ensure that approval. The cases on the point are clear. In *United States v. Alfisi*, 308 F.3d 144 (2d Cir. 2002), the defendant was convicted for violating a statute which outlawed payments "to influence any official act." *Id*. at 150-51. Defendant, an employee of a food wholesaler, paid money to one Cashin, a USDA inspector. On appeal, defendant argued that "he should not be found guilty of bribery if he paid

14

money to Cashin solely to induce him to perform his job faithfully." *Id.* at 150.  The Second

Circuit made short shrift of this argument:  "It cannot be seriously argued that Alfisi's payments

did not fall within [the statute's] broad language, even if he was paying Cashin solely to make

accurate inspections," since "there is no lack of sound legislative purpose in defining bribery to

include payments in exchange for an act to which the payor is legally entitled." *Id.* at 151

(footnote omitted).  *See also United States v. Manton*, 107 F.2d 834, 845-46 (2d Cir. 1939) (in

prosecution for bribing a judge, the trial court correctly refused to charge the jury that it might

consider whether the decisions rendered by the judge after accepting a bribe were correct in law;

"[t]he conspiracy here contemplated the payment of money to induce a judge to exercise his

judicial power in favor of the bribe-givers, without regard to the merits. If the decisions finally

rendered in pursuance of the conspiracy be legally sound the fact is immaterial.").  In the case at

bar, defendant's asserted entitlement to the P & Z Commission's approval is irrelevant to the

bribery charge against him, and Attorney Thomas may not testify on the subject.  Defendant's

briefs cite no cases to the contrary.

One would have thought that Ruling XIII sustaining the government's objection was

clear enough, but defendant now files a statement of his intention to call Attorney Thomas as an

expert witness "in order to allow him to testify about the Zoning & Inland/Wetland laws and

regulations applicable to land development generally and in Shelton, [and] in particular as it

applies to these developments."  As to the 828 Bridgeport Avenue development, Attorney

Thomas "will describe the application before Planning & Zoning as a certain type of approval

known as a 'special exception'" and "opine" on "the standards of appellate review from an

adverse decision by the Planning & Zoning Commission." [Doc. # 261] at 2. This proffer is

puzzling, since it is precisely the same subject matter and type of evidence to which the government previously objected, and Ruling XIII sustained that objection.

Of course, the defendant's criminal intent is an issue in the trial.  But defendant is not without access to legitimate evidence on that point.  Defendant may testify himself as to his intent or lack of it, if he is willing to submit to cross-examination.  As for Attorney Thomas, Ruling XIII went as far as possible: it allows him to testify "regarding any advice he gave as defendant's attorney during the zoning process that the project would definitely or likely be approved by the Zoning and Planning Commission."  [Doc. # 257] at 6.  "Gave" means (if any further clarification is necessary) "gave to the defendant."  But such testimony will be succinct.  On direct examination, defense counsel may establish the nature of Thomas's practice and his attorney-client relationship with defendant.  He could then inquire whether Thomas had an opinion as to whether or not the application would be approved, and if so, whether, how, and when  he advised the defendant of that opinion.  As stated in Ruling XIII, defendant must waive his attorney-client privilege to permit such testimony, and the privilege may not be reasserted to block the government's cross-examination where it would be unfair to do so.  On that point, *see In re Sims*, 534 F.3d 117, 132-33 (2d Cir. 2008) (collecting cases).

I have preferred to decide this question on the merits, but the government is correct in its assertion that defendant's proffer of Attorney Thomas as an expert witness fails to comply with Fed. R. Crim. P. 16(b)(1)(C)  in terms of its timeliness and content.  The proffer is rejected on that alternative ground as well.

16

Dated: New Haven, Connecticut

February 23, 2010

_____/s/ Charles S. Haight, Jr._____
Charles S. Haight, Jr.
Senior United States District Judge